**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHANITA GRAY, | ) | Case No. 4:23-cr-00677-MTS |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

Defendant Shanita Gray pleaded guilty to one count of Use of Counterfeit Access Device, in violation of 18 U.S.C. § 1029(a)(1). She admitted to knowingly devising a scheme to obtain money and investments by defrauding financial institutions and by using an elderly family member's personal identifying information and a fraudulently obtained durable financial power of attorney to access the family member's financial account for her own personal benefit. Defendant pleaded guilty to the offense and was sentenced to 100 months of imprisonment and ordered to pay $452,076.04 in restitution. Defendant subsequently filed a notice of appeal. The matter now before the Court is Defendant's Motion for Release on Bond Pending Appeal. Doc. [211]. The Government filed its Response, and the matter is now ripe for ruling. Based on a review of the entire record before the Court and for the following reasons, the Court will deny Defendant's Motion.

**I.     Background**

On December 6, 2023, Defendant was charged in a fifteen-count indictment: Counts 1-10 Wire Fraud in violation of 18 U.S.C. § 1343; Count 11 Fraudulent Use of a Counterfeit Access Device in violation of 18 U.S.C. § 1029(a)(1); and Counts 12-15 Aggravated Identity Theft in

violation of 18 U.S.C. § 1028A.

On February 2, 2024, Defendant was interviewed by the U.S. Probation Office in the Northern District of Georgia and appeared before Chief United States Magistrate Judge Russell G. Vineyard. Defendant was released on a $25,000 unsecured appearance bond and special conditions of release were ordered. *See* Docs. [8] and [9]. Defendant began courtesy supervision by the Northern District of Georgia Pretrial Services Office, where Defendant's family resides. *Id*. On February 16, 2024, Defendant appeared before United States Magistrate Judge Rodney H. Holmes for arraignment. Defendant was continued on bond, and the previously ordered conditions of release were adopted. Doc. [17].

On February 21, 2025, a violation report was filed by pretrial services, due to Defendant sending email correspondence to UBS employees, a company named in the Indictment. Doc. [70]. As a result, pretrial services reviewed Defendant's pretrial conditions with her, including the condition regarding avoiding all contact, directly or indirectly, with any victims or witnesses. *See* Doc. [82-2] at 2.

On April 14, 2025, the Northern District of Georgia courtesy Pretrial Officer notified the Eastern District of Missouri's Pretrial Services Office that their district would be terminating courtesy supervision as they deemed Defendant "not amenable to supervision due to continued resistance with supervision and supervision directives." Doc. [82] at 1. On April 21, 2025, based upon the Northern District of Georgia's notification and Defendant's previous violation of pretrial conditions on February 21, 2025, a warrant was issued for Defendant. On May 8, 2025, Defendant appeared before United States Magistrate Judge John K. Larkins, III, of the Northern District of Georgia, Atlanta Division, for an initial appearance. *See* Doc. [88]. Although Judge Larkins issued an order denying the Government's motion to detain Defendant pending the final

2

bond revocation hearing in the Eastern District of Missouri, his order stated "[t]o be sure, the Court disapproves of in the strongest possible terms Defendant's hostility toward her supervising officers and the disrespectful tone of her communications with them." *Id*.

A bond revocation hearing was subsequently set for May 16, 2025. At the hearing, Judge Holmes heard testimony and argument concerning the issues precipitating the Northern District of Georgia terminating courtesy supervision of Defendant.  At the hearing, Judge Holmes allowed Defendant 30 days to either be accepted for courtesy supervision in the Northern District of Georgia or relocate to the Eastern District of Missouri. On May 30, 2025, Judge Holmes issued an Order stating that the Northern District of Georgia advised they would not provide courtesy supervision of the Defendant, and that Defendant was directed to relocate to the Eastern District of Missouri and to report to the Eastern District of Missouri Pretrial Services Office on or before June 16, 2025. Judge Holmes also modified Defendant's pretrial release conditions to include the Location Monitoring Program, and restricted Defendant's travel to the Eastern District of Missouri. Doc. [93].

 On June 3, 2025, Defendant filed a motion for reconsideration and requested a stay of the modification of pretrial release conditions, suggesting that she should be allowed to continue to reside in the Northern District of Georgia and be supervised by the Eastern District of Missouri remotely; through weekly phone check-ins and/or periodic in-person appointments with her assigned pretrial services officer, or whatever other arrangements could be made. Doc. [95]. The Government opposed the motion. On June 9, 2025, Judge Holmes issued an order denying Defendant's motion for reconsideration, Doc. [98], and ordered modification of Defendant's pretrial release conditions to allow Defendant thirty days (from May 16, 2025) to relocate to the Eastern District of Missouri. Doc. [97].

On June 10, 2025, Defendant filed a Motion for District Court's Review and Amendment of Magistrate Court's Order on Petition for Action on Conditions of Pretrial Release and Stay of Modification of Pretrial Release Conditions. Doc. [100]. This Court stayed modification of Defendant's pretrial release conditions, pending review of Defendant's motion. Doc. [102].  Once again, Defendant requested that this Court allow her to continue to reside in the Northern District of Georgia and allow her to be supervised by the Eastern District of Missouri remotely; through weekly phone check-ins and/or periodic in-person appointments with her assigned Pretrial Services Officer. Defendant argued that she did not have any issues regarding her pretrial supervision for almost a 12-month period, she and her daughter had health issues, and it would be an extreme financial hardship for Defendant and her family if she were required to relocate to the Eastern District of Missouri. On June 17, 2025, this Court issued an order denying Defendant's motion. The order documented that Defendant had compliance issues with her conditions of release since the Fall of 2024. The Order stated,

> Among other compliance issues, Defendant had corresponded with victims and potential witnesses, failed to prove verification of her attendance with various mental health counselors, displayed hostility and yelled at pretrial officers during a home visit - requiring the visit to be terminated by the officers, and had seemingly attempted to conduct her pretrial release as she sees fit.[1] Despite the chances Defendant has been given to comply with conditions of release that would have allowed her to remain on courtesy supervision within the Northern District of Georgia, Defendant has instead thumbed her nose at directives given to her by pretrial services officers in two districts.

Doc. [103] at 4. Although Defendant's motion was denied, she was allowed twenty-one days to relocate to the Eastern District of Missouri. *Id.*

On June 25, 2025, Defendant filed a Notice of Appeal and Request for Emergency Stay of

---

[1] For example, Defendant had email exchanges with pretrial officers from both the Eastern District of Missouri, and Northern District of Georgia, wherein she stated she did not want officers to come to her residence without notice and requesting that officers refrain from contacting a new counselor to verify attendance until "a rapport had been established." Doc. [103] at 4.

4

Modification of Pretrial Release Conditions at the United States Court of Appeals for the Eighth Circuit. Doc. [105].[2] The Eighth Circuit denied the request for stay on July 1, 2025. On July 31, 2025, the Eighth Circuit issued an unpublished opinion affirming this Court's conditions of pretrial release. No. 25-2275; *See* Doc. [131].

On August 6, 2025, Defendant pleaded guilty and then filed a Motion for Bond Modification Pending Sentencing, the following day. Doc. [137]. The motion was denied. On August 15, 2025, Defendant filed an Emergency Motion to Travel, Doc. [141], and on October 1, 2025, Defendant filed a Motion for Modification of Bond Conditions Pending Sentencing, or in the Alternative, Motion to Travel, Doc. [150]. Defendant requested that this Court remove her from the electronic monitoring program and allow her to return to her residence in the Northern District of Georgia and check-in remotely with her pretrial release officer, as well as return for in-person meetings as requested. *Id*. In the alternative, Defendant requested a travel permit to the Northern District of Georgia so that Defendant could see her family, and to prepare for sentencing. *Id*. Defendant listed health concerns of her minor daughter as well as her own in the motion. *Id*. On October 7, 2025, this Court granted Defendant's motion. Doc. [152]. She was removed from the electronic monitoring program, allowed to travel to and reside in the Northern District of Georgia, with courtesy supervision to be coordinated with the United States Pretrial and Probation Office for the Northern District of Georgia. *Id*.

In December of 2025, Defendant was sentenced to 100 months of imprisonment, three years of supervised release, and ordered to pay $452,076.04 in restitution. She was remanded to the custody of the United States Marshals to begin serving her sentence.[3] Defendant subsequently

---

[2] Despite the pending appeal, Defendant filed Defendant's First Motion to Travel with this Court on July 14, 2025. This Court denied the motion. See Doc. [115].

[3] The Court set forth her request to the BOP to serve her sentence as near to Gwinnett County, Georgia as possible, so her family could visit her.

filed a notice of appeal with the Eighth Circuit, and on February 24, 2026, filed with this Court a Motion for Release on Bond Pending Appeal. Doc. [211].

## II.      Legal Standard

Pursuant to 18 U.S.C. § 3143(b), release on bond pending appeal is only available in limited circumstances. The statute provides in pertinent part:

> (1) [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds--
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

A defendant bears the burden of establishing that they are entitled to release pending appeal. *United States v. Powell*, 761 F.2d 1227, 1232 (8th Cir. 1985) (en banc). The Eighth Circuit has explained that the "Bail Reform Act of 1984 made it much more difficult for a convicted criminal defendant to obtain his release pending appeal. The Act's intent 'was, bluntly, that fewer convicted persons remain at large while pursuing their appeals.'" *United States v. Marshall*, 78 F.3d 365, 366 (8th Cir. 1996) (per curiam) (quoting *Powell*, 761 F.2d at 1231).

## III.     Discussion

First, this Court will review whether the appeal is not for the purpose of delay and if it "raises a substantial question of law or fact likely to result" in a reversal, an order for a new trial, a sentence short of imprisonment, or a sentence "less than the total of the time already served plus the expected duration of the appeal process." § 3143(b)(1)(B). Regarding the substantiality prong, a defendant "must first show that the question presented by the appeal is substantial, in the sense

6

that it is a close question or one that could go either way." *Powell*, 761 F.2d at 1233-34. It is not sufficient to show simply that reasonable judges could differ … or that the issue is fairly debatable or not frivolous. *Id*. at 1234. "If this part of the test is satisfied, the defendant must then show that the substantial question … is so integral to the merits of the conviction it is more probable than not reversal or a new trial will occur if the question is decided in defendant's favor." *Id*.

Here, Defendant merely proclaims that her appeal is not for the purpose of delay and leaves it at that. She then argues that the appeal raises substantial questions of law and fact likely to result in reversal or a new sentencing hearing. She claims that this Court erred in calculating the loss amount because it was improperly inflated by including amounts not directly caused by her conduct, that the denial of a two-point reduction for acceptance of responsibility appears to be related to the loss amount, and that her "role as a family caregiver in a crisis, her lack of criminal history, and the absence of personal enrichment . . . may not have been given sufficient weight against the backdrop of the disputed loss amount." Doc. [211] at 4.

Defendant's bare bones argument fails to set forth what amounts were purportedly included in the loss amount in error or how the purported loss amount would impact her sentencing range. The sentencing transcript outlines in detail the discussion concerning loss amount. The Government presented two witnesses who clearly established a loss amount of $452,076.04. Even if this Court were inclined to consider a credit, the loss amount would not make any difference to the offense level.[4] Defendant conceded that she would be unable to put forth evidence of more than $200,000 in credit that would be needed to even trigger such a reduction. *See* Doc. [197] at 77.

As for Defendant's claim concerning the denial of a two-point reduction for acceptance of responsibility, the Court notes Defendant's statement at sentencing that she,

---

[4] U.S.S.G. 2B1.1(b)(1)(G) – the total loss was more than $250,000 and less than $550,000, increase by twelve levels.

would never do anything to purposely hurt my uncle or my aunt's legacy. I know and I do take responsibility for all of how this transpired. In my mind, it was the only way I could help him. I would never do anything purposely to hurt my uncle and my aunt, and I do take responsibility for this. It was out of trying to help.

*Id*. at 91. This Court then addressed Defendant's remark, stating, "the Court is going to revisit its ruling on acceptance of responsibility at this time. I'm going to revoke the two points that [were] previously awarded." Doc. [197] at 91. The Court explained,

in her statement to the Court just now, the defendant said she didn't do anything on purpose and that she would only trying to help her uncle, and those are ludicrous statements. Number one, this was all done on purpose as evidenced by what we heard here today … but there was definitely premeditation, planning, and execution of a sophisticated fraud to take your uncle's money.

*Id*. at 92. The Court further remarked that Defendant's expenditures indicated the "bald greed that [she] displayed" in utilizing the funds and that it goes against acceptance of responsibility. *Id*. As shown by the record, Defendant's words and actions did not equate to acceptance of responsibility.

Finally, as to Defendant's "absence of personal enrichment" not being given "sufficient weight," the Court notes Detective Starck's testimony as to some of the expenditures,

There was a vacation package valued at $25,828.79; $39,379 in transfers from this account to various Zelle accounts belonging to the defendant, her husband and daughter, [and] other family members. There were multiple purchases of Louis Vuitton products, Gucci, Versace, several I believe -- if you could move that up just a bit to the next page -- over $8,000 in jewelry, hotels, [and] vehicle-related purchases.

*Id*. at 24-25. This case is permeated by the Defendant's clear pursuit of personal enrichment, and the substantial weight of the evidence supporting this conclusion cannot be overstated. Clearly, Defendant has failed to meet her burden of demonstrating that her appeal presents substantial questions—namely, issues that are close or could reasonably be decided either way. *See Powell*, 761 F.2d at 1233-34.

Because Defendant has failed to establish the requirements of § 3143(b)(1)(B), the Court

need not reach § 3143(b)(1)(A), which mandates detention unless the Court finds, by clear and convincing evidence, that the Defendant is neither likely to flee nor poses a danger to any other person or the community. Nevertheless, the Court will address Defendant's arguments. Defendant claims her strong and compelling ties to her family and community, particularly her young daughter, provide clear and convincing evidence she is not a flight risk. Defendant also maintains that her "history on pretrial release demonstrates her reliability," and her "complete and unwavering compliance with all Pretrial Services conditions reflect her respect for the Court's authority." Doc. [211] at 3. She further states that she "complied with Pretrial Services requirements without incident, demonstrating diligence, accountability, and respect for the Court's directives." Doc. [211] at 2-3.

The record before this Court is replete with Defendant's abhorrent criminal activity involving her own family members and her unacceptable behavior while on release. While this Court did allow her to return to Georgia in October of 2025 prior to sentencing to manage her affairs and to address her personal health concerns and those of her minor daughter, Defendant's overall performance and behavior while on release was nothing short of disrespectful and entitled. *See* Doc. [103] at 4. Furthermore, Defendant's conduct at sentencing and her submission of a deceptive financial affidavit in support of her in forma pauperis motion on appeal, demonstrates her willingness to take whatever measures she deems necessary to obtain her desired outcome. As stated by this Court at sentencing,

> I have to comment on your behavior throughout this entire case. The audacity to use your daughter's condition the way you have here today. You don't have to be away from your daughter except for your greed. You don't have to spend one day apart from her except for your greed, your thievery, your theft, your just absolute -- it is one of the most outrageous acts. And you describe it as a decision. It wasn't a decision. It was an attack plan that you executed on relentlessly […]

Doc. [197] at 98.

9

## CONCLUSION

Defendant failed to demonstrate that her appeal is not for purpose of delay and presents substantial questions. Furthermore, Defendant is facing a lengthy sentence, and her conduct reflects a persistent willingness to employ any tactics necessary to achieve her objectives. As such, this Court does not find that there is clear and convincing evidence that Defendant is not likely to flee or pose a danger to the safety of any other person or the community.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Release on Bond Pending Appeal, Doc. [211], is **DENIED**.

Dated this 27th day of March, 2026

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE